## NORTHWAY v ELDER & JOHNSTON CO.

Ohio Appeals, 2nd Dist, Montgomery Co.

No. 1606. Decided Jan. 26, 1940.

# 550

Sam Kelly, Dayton, and Lawrence Baver, Dayton, for plaintiff-appellee.

Marshall, Harlan & Marshall, Dayton, for defendant-appellant.

## OPINION

By BARNES, J.

The above entitled cause is now being determined as an error proceeding by reason of defendant's appeal on questions of law from the judgment of the Court of Common Pleas of Montgomery County, Ohio.

Ada L. Northway, a, married woman 45 years of age, and for some 13 years continuously employed in the office of Dr. Hudson, an oral surgeon, located on the 11th floor of the Reibold Building, Dayton, Ohio, on the morning of October 12, 1938, at 8:30 A. M. took the elevator at the ·Fourth Street entrance of said building, and when alighting on the eleventh floor had an accident, which was the basis of this law suit.

The defendant, Elder & Johnston Company, at all times mentioned was the lessee, and in sole and exclusive control of the said Reibold Building. Plaintiff, through her petition, claims that the defendant through a duly employed operator at one of its elevators was guilty of actionable negligence, which was the proximate cause of the accident and resultant injuries.

We quote from the petition in full the alleged negligent conduct:

"That said elevator was brought to a stop by the operator thereof at the 11th floor of said Reibold Building, and that the operator thereof opened the doors of said elevator for the purpose of enabling plaintiff to disembark; that as the plaintiff was leaving said elevator to enter the 11th floor hallway said elevator dropped, causing this plaintiff to be forcibly thrown upon the floor of the hallway, resulting in a diminution of the joint space between the 5th lumbar and sacrum."

The claimed injuries are more fully set forth as follows:

"Plaintiff says that all of her said injuries were directly and proximately produced through the negligence, carelessness, and unlawful conduct of the defendant, as hereinbefore set forth.

Plaintiff says that as a result of her injuries she has suffered extreme pain of body and mind; that she has been and is forced to wear a special sacroiliac garment to help support her spine, and will have so to do in the future; that she had been forced to use a specially constructed shoe with certain leather supports placed therein to relieve the pain in her back; that she believes, and, therefore, avers that her said injuries are permanent. That she has incurred doctors' bills to date in the amount of $150 and will be compelled in the future to incur additional doctor bills; all to her damage in the amount of $25,000."

Defendant's answer admitted all allegations of the petition, except the claimed acts of negligence. It specifically admits that plaintiff was a passenger on the elevator on the day in question, but specifically denies any negligent operation of the elevator. It was the averment of the answer,

"That as said plaintiff was leaving said elevator, there was a slight difference, consisting of slightly, more or less, of one inch, between the level of the floor of the elevator and the connecting hallway.

This defendant admits that as plaintiff stepped from the cab to the hallway, one of her shoes caught on the ledge, and the plaintiff was slightly thrown off balance thereby.

This defendant denies that said plaintiff fell to the floor or that any other violence occurred to this plaintiff at said time.

Defendant being uninformed as to any other injuries or doctors' bills denies the same."

The petition was filed on January 27, 1939, and the trial started on June 26, 1939, ending on June 28, and resulting in a verdict for the plaintiff in the sum of $10,000.

Thereafter all essential steps were taken whereby the case was duly lodged in our court through appeal on questions of law.

Appellant in its assignment of errors sets out 9 separately stated and numbered specifications. The specifications are very general and in the main follow the language of the motion for new trial.

Appellant's brief does not attempt to follow the order set out in the assignments of errors, and, consequently, we find this later document of little value to us. It is always the desire that the specifications in the assignments of errors be specific and thereafter that the briefs follow such assignments in the same order. A reference to Amended Rule 7 of our Court as to briefs and assignments of errors will be much more helpful to the Court if followed

Appellant's brief is argumentative in form, setting out the claimed errors as they naturally arise in the course of the argument.

We have laboriously attempted to segregate the claimed errors. We first take up the claimed errors arising in the taking of testimony.

On page 5 of Appellant's brief a complaint is made that Dr. Brumbaugh, a witness for plaintiff, refused to be cross-examined, and that the Court sustained the witness. Reference is made to page 61 of the record.

An examination of this page of the record will disclose that counsel does not correctly interpret.

Dr. Brumbaugh did not refuse to be cross-examined; but, on the contrary, the record discloses that he answered all questions. The only action of the Court was to sustain a motion made by counsel for plaintiff to strike out a side remark made by counsel conducting the cross-examination.

On page 6 of brief, attention is called to claimed erroneous action of the trial court in sustaining objection to a question asked of Mr. Ruwoldt, a witness called by defendant. Mr. Ruwoldt held the position as elevator starter in the Reibold Building. He had been qualified as an expert in the operation of elevators. On pages 90 and 91 of the record it appears that counsel for defendant was seeking to establish that the elevator could not have dropped a distance of 10 or 12 or more inches as was claimed by plaintiff. On page 91 the following question was presented to Mr. Ruwoldt:

"Q. All right, she—when she got up and looked back, the car had gone so low, all you could see was the man from his knees up with the door open. Is that a possibility?"

Objection was interposed, and the Court sustained the objection with the following statement:

"THE COURT: That is argumentative, I think, you can answer whether or not the car can drop after the doors are open."

We have no hesitancy in determining that the trial court was correct in its ruling.

On pages 7 and 8 of Appellant's brief, complaint is made that the Court erred in permitting testimony of Miss Vera Carpenter, a witness called by the plaintiff in rebuttal.

It is disclosed from the record that Miss Carpenter is a stenographer engaged in the office of the Prosecuting Attorney, and therein associated with

Assistant Prosecutor Kelly, who was counsel for the plaintiff in the instant case. It further appears that while the case was pending and before trial the plaintiff caused the deposition to be taken of Mr. W. E. McCalvey, who was the operator of the elevator on the morning of the alleged accident.

Mr. McCalvey was called as a witness by the defendant and after testifying in chief was cross-examined by Mr. Kelly. During the time of cross-examination, a foundation was laid for impeachment. This witness when examined in chief during the trial testified that the elevator did not drop on the morning of the claimed accident. In cross-examination this witness was inquired of if he had not made a different statement when his deposition was taken. Counsel put to the witness what purported to be the exact language of the question and answer and then asked if such question was not asked, and if he had not so answered. He replied that he did not remember. Other questions and answers were propounded of the same character. Counsel in rebuttal called the stenographer and asked her the direct questions as to whether or not the witness, McCalvey, had been so interrogated and so answered. Counsel contended that the witness should have been permitted to read the question and answer instead of counsel propounding it in a way so that it could be answered by yes or no. This objection is not well taken. The recognized and approved method of asking impeachment questions was correctly followed in this instance.

On page 5 of Appellant's brief, complaint is made that counsel for plaintiff made erroneous statement in the presence of the jury relative to a claimed legal requirement in stopping elevators. This objectionable instance appears on page 80 of the record. Mr. L. H. Ruwoldt was being interrogated by counsel for defendant; the witness was being inquired of as to what would be an average, normal, and good stop on elevators of the type used in the Reibold Building; the following question was propounded by counsel for defendant:

"Q. You have been there 25 years and you feel you are in a position to tell this jury what a normal, average elevator stop is with that type of elevator in regular use?"

Mr. Kelly, counsel for plaintiff, interposed objection with additional comment, all as follows:

"MR. KELLEY: We object to that question, if Your Honor please, for the simple reason that the law specifies that the elevator floor should be level before the door is open."

Counsel for defendant objected to the remark, and thereafter followed a colloquy between counsel. The record discloses that counsel were then called to the Bench. The record discloses the following:

"MR. KELLY: We will withdraw the objection."

Counsel for appellant admits that this would cure the claimed error of erroneous statement of the law, but complains that same was again called to the attention of the jury. On page 83 of the record this claimed error presents itself through the following questions and answers:

"MR. KELLY: You are likewise acquainted with the legal requirements for attachments on elevators, aren't you?
MR. HARLAN: I object.
MR. KELLY: He is an expert; he qualified it.
MR. HARLAN: In the operation of elevators, not the law.
THE COURT: Sustain the objection."

Of course, the inquiry made by counsel was improper, but objection was interposed and sustained by the Court, and, therefore, we find nothing prejudicial.

Immediately after sustaining the objection the record discloses the following:

"(Reads) Q. Are those elevators equipped with electric interlocking attachments?

MR. HARLAN: I object.

(Reads) To prevent the door from being open?

MR. HARLAN: I object.

(Reads) Q. Unless the car is at the floor level?

MR. HARLAN: I object to the question.

THE COURT: Overrule the objection. I think it is proper for him to state what the equipment on the elevator is."

Complaint is made in the brief that counsel for plaintiff read to the jury §12600-59 GC, which is a section applying to safety devices in school building elevators and has no application to elevators in office buildings. The record fails to sustain this contention of counsel, except it may be inferable from the above quoted portion of the record that counsel was reading from some book when he was making the interrogation of the witness. We so conclude from the fact that the word "Reads" appears in front of the last three questions.

We find nothing prejudicial in the above.

The claim is made that the trial court erred in not charging the jury as to the degree of care required in supplying equipment.

There was contained in the Court's charge to the jury, among other things, the following:

"A company operating passenger elevators in its office building for the use of its tenants and their patrons is a common carrier of passengers for hire, and as such is required to exercise the highest degree of care of prudent and cautious men reasonably consistent with the practical operation of its elevators, and its undertaking and its liability to its passengers go to the extent that as far as human foresight can reasonably go it will transport them safely."

Counsel for appellant accept the above as a correct statement of law, but urge, in view of the fact that the evidence might raise some inference of defective appliance, that the instruction should have been qualified to not only cover actual manipulation, but the furnishing of equipment as well.

An examination of the pleadings will disclose that plaintiff's petition made no complaint as to the equipment.

We find no place in the record where testimony was introduced for the purpose of injecting into the case the issue of defective equipment.

The Court did permit inquiry as to what the equipment was, and as we think rightly so, in order to present further testimony as to the mechanical operation of such elevators.

Counsel for appellant made no request to the Court to give any charge in respects now complained of. For this reason this claimed error cannot be raised.

The law is well recognized that where the instruction correctly states the law, but counsel make the claim it is not as full and complete as it should be, no claim of error will be considered, unless counsel have specifically requested the Court to charge the added matter. We find no prejudicial error in the charge of the Court.

A further claimed ground of error was misconduct of counsel for plaintiff. This presents a very serious question and demands a very careful analysis in view of the claimed excessiveness of the verdict. That the record discloses some inflammatory and improper argument is obvious. Whether or not it is prejudicial, or if prejudicial was cured by the action of the Court, is the real question now to be determined. The misconduct complained of appears in the closing arguments of counsel for plaintiff. A portion of the argument of counsel for defendant was taken and is transcribed in the record. Some of the inflammatory remarks were replies in kind, and the courts have held that counsel may, within proper limitations retaliate. We have been referred to a

number of Ohio cases through which the principle has been enunciated as to what does and what does not constitute misconduct in arguments to the jury. A complete treatise on the subject will be found in **Vol. 39, O. Jur.,** under subject **Trial,** starting at **Sec. 129** and continuing to **Sec. 136,** inclusive. Every Ohio court decision is referred to in the note, and the text is built up from Ohio cases. The following excerpts are taken from the argument:

"Of course, can't you see this elevator man's position? He is 55 years old, has worked at this and that. Has a job; he needs his job. Even Mr. Harlan mentions that to you. He wants you to think if you bring in a verdict for the plaintiff, the elevator man will lose his job. Talk about unfair tactics, he would have lost his position long before this, but they wanted to use him, because it would be an admission there was some fault in his operation.

MR. HARLAN: I object.

THE COURT: Objection sustained.

MR. KELLY: But he had nothing to do, but—

MR. HARLAN: I don't care what counsel says about me, but I wish the jury would be instructed on that remark.

MR. KELLY: I just offered it as an opinion, Your Honor.

THE COURT: Objection was made to the statement where the elevator operator would lose his job after the case was over. The Court will sustain that objection, and you are not to consider that in your deliberation in the case.

MR. KELLY: Don't consider—let me join the Court. Don't consider it. It is improper. But the elevator man at the time of his deposition when I asked if he had told anyone that the elevator had dropped he said he didn't know, etc."

Again on page 161 of the record:

"You are not to consider who the defendant in this case is, and it does not make any difference. You are just here, if you find liability, to determine the amount of the damage.

Now being a big business. running a big store and coming in constant contact with the people they know and have found out over a period of a good many years just what risks the contact with the public involves and they have an accounting and a cost department and undoubtedly they figure the cost of that risk into the █ operation of their business, which automatically gets into the cost accounting department, etc—.

MR. HARLAN: I object and ask the Court to instruct the jury that this type of argument hasn't anything to do with this case and must not be considered.

THE COURT: I will sustain the objection and direct the jury not to consider the matter of argument involving any costs system whereby the defendant may have figured out the risk and provided for it.

MR. KELLY: I am merely trying to impress you with the fact it doesn't make any difference who the defendant is. I don't want a cent more than you believe this woman is entitled to.

(Continuing) "Now in the preparation of this case speaking of Dr. Price who is supposed to be a lawyer's roentgenologist. We believe there was no reason for you to indulge in any more speculation than was absolutely necessary as to what this woman's condition was. We felt it was our duty, as lawyers, to our client, to █ bring you the very best we could. It appears to be my personal opinion that Dr. Jerry Price is "tops" as a roentgenologist, not only in Dayton, Ohio, but ne has been recognized nationally as one of the three recognized roentgenologists in the State of Ohio. You saw him—

MR. HARLAN: I object, there isn't a word of testimony of that kind in the case—not a word.

THE COURT: Sustain the objection. There is no evidence as to that.

MR. HARLAN: Why not talk about the case?

MR. KELLY: All right, leave that out . You saw Dr. Price on the witness stand; you heard him testify. You are in position to know what he is talking about," etc.

There are some other matters complained of, but we do not consider them of sufficient importance to refer to or quote.

That the three excerpts above quoted taken from the reply argument of counsel for plaintiff are improper is in our judgment beyond question. In support of this conclusion we again refer to the text under 39 of O. Jur., subject Trial, Sections 129 to 136 inclusive, and the citation to notes thereunder. Also reference to same sections under 1939 cumulative supplement. It is not the policy of the law to grant new trials for infractions of this █ character where the matter had been properly handled by the trial court and presents an inferable conclusion that the jury were not influenced by such improper argument.

In the instant case the Court sustained objections and instructed the jury not to consider. Defending counsel in at least two instances joined in the Court's conclusion and admitted that the argument was improper and asked that it not be considered. There are instances where the remarks are so improper and inflammatory that no admonition of the Court or apology of counsel will remove the injurious effect. Under the situation in the instant case we are unable to conclude that the improper remarks would have an injurious effect. The one thing in addition that the Court might properly have done would have been to have acted just as he did with- without objection and request from defendant's counsel; in fact, this is recognized as a better procedure to follow Again we refer to 39 O. Jur., supra.

The remaining claimed error is that the verdict is excessive and against the manifest weight of the evidence. These two grounds of errors are so closely re-lated that we will discuss them together.

It is the claim of the defense that the plaintiff failed to adequately prove the claimed negligence against the defendant.

Other than the plaintiff and the operator of the elevator, there were no eyewitnesses.

It is conceded that the plaintiff was the only passenger on the elevator when it stopped at the 11th floor to permit her exit. According to her testimony the operator had some difficulty in leveling the elevator with the corridor floor before opening the door, and as she stepped into the corridor with her right foot she felt the elevator drop under her left foot and this threw her off balance and she stumbled along for from 8 to 10 feet, finally going down on her hands and knees. At that moment as she looked back she could see the elevator door still open and could see the operator at about the height of his knees. From this she calculates that the drop must have been about 10 inches.

The operator testified that there was no drop of the elevator, but that when he stopped and opened the door, which lacked about one inch or less of being level with the corridor floor, and as she stepped out she stubbed her toe and was off balance for a few feet, but did not fall at all. Plaintiff says and the operator admits that very shortly thereafter she returned to the elevator and asked him to report the incident, she stating that she was hurt. Plaintiff further testifies that at that time she asked the operator what in the world was the matter and the operator stated the elevator dropped. This statement was denied by the operator. Through cross-examination of the operator as to some contrary statement that he had given in a deposition and the testimony of the stenographer taking the deposition evidence of some equivocation was presented

Testimony of another witness called by the defendant who was in charge of the elevators at the Fourth Street entrance, and called as an expert, testified that it would be impossible for

the elevator to drop a distance of more than 3 inches, and further that it had a safety which would prevent the elevator dropping when the door was open. This witness also testified that he immediately, after the report was made to him, examined the elevator and found it was in perfect working order.

This presents a very close factual question, but it was one for the jury, and it having found for the plaintiff and the trial court having later overruled the motion for new trial, this Court is not inclined to disturb on the question of liability.

The more serious question is the amount of the verdict. According to plaintiff's testimony she remained at her work during the remainder of the day, but suffered pain in her leg and back. At the termination of her day's work she went to an osteopath in the same building and continued taking treatments from him for about four to six weeks, without relief. The osteopath, not being able to relieve her from her pain and suffering, suggested that she go to an orthopedic surgeon, and she then went to see Dr. Brumbaugh. The latter immediately advised that ex-rays be taken, which was done. From these x-rays, in connection with the history and examination, Dr. Brumbaugh diagnosed the trouble as a diminution of the joint space between the fifth lumbar and sacrum. This surgeon further testified that as an aid to his diagnosis, and for the purpose of correcting posture, he prescribed arch supports in her shoes and a sacroiliac belt. Plaintiff says that she wore all these appliances continuously, and was wearing them at the time of the trial; further, that she had not been relieved from pain, but that her suffering had continued to the same degree without alleviation. The pain and suffering was described in detail, although she admitted that she had not lost a day's work. Plaintiff had continued in her employment just the same as before. Her suffering was possibly greater at night, which some one or more of the physicians explained as being natural and due to the fact that at night there would be a relaxation so that the muscles would not act as support as they would do when she was up and around performing her work. Most, if not all, of the symptoms were subjective. Immediately after the accident there was a swelling discernible to the osteopath. Plaintiff, in addition to the osteopath Dr. Brumbaugh, also called Dr. R. J. Price, a specialist in x-ray work. Dr. Henry Snow, also an expert in x-ray work, was called by plaintiff and identified certain x-ray pictures taken by him shortly after the accident. Counsel for plaintiff did not interrogate Dr. Snow as to her interpretation, but defendant called him in the presentation of their case, and his evidence was to the effect that he found no pathology. Aside from plaintiff's testimony explaining claimed pain and suffering, all of the testimony relative thereto was necessarily that of medical men, and the exact nature of the claimed injury was necessarily diagnosed from the x-ray, coupled with their expert opinions as to the effect. In addition to Dr. Henry Snow, defendant called and examined Dr J. A. Judy, the latter also an orthopedic surgeon.

Three different sets of x-rays were taken at different times, the last two being taken shortly before the trial. Dr. Judy examined the plaintiff shortly before the trial at the instance of the defendant. At the time of his examination he had x-rays taken for the purpose of assisting him in his diagnosis, but these were not introduced in evidence. All surgeons and x-ray men who examined the pictures were in agreement that there was a diminution of the joint space between the fifth lumbar and sacrum, but there was a marked divergence of opinion as to the extent of the diminution, its probable cause and effect. We think it is proper to say that none were able to demonstrate to a certainty the effect or result of this diminution of joint space. It was the general concensus of opinion among the medical men that an injection of a fluid would enable them to determine definitely whether or not there was a puncture of the envelope permitting the fluid to escape there-

from, but none advised the experiment unless it was definitely determined to try an operation; neither was there a recommendation that an operation be had. In the event of an operation it was estimated that a year's time should be taken to convalesce, with no guarantee as to the results. It seems to us in the final analysis that a great deal depends on whether or not the plaintiff's pain and suffering was real or feigned. Again on this question the jury was in better position than could be a reviewing court to determine what credit should be given to the testimony of any and all witnesses; furthermore, we must recognize that the trial court had a duty to perform, and we must indulge the presumption that he met this duty with judicial consideration. The trial court, just as the jury did, saw and heard all witnesses and was in a position to determine credibility in a manner not to be approached by a reviewing court from the cold type. As heretofore stated, the amount of the verdict was large, and from the state of the record we would not have been surprised had the jury returned a much lesser amount or had the trial court reduced the amount of the verdict, but having passed both the jury and the trial court, we will not molest.

Finding no prejudicial errors, the verdict of the jury and judgment of the court will be affirmed.

Costs adjudged against appellants.

HORNBECK, PJ. & GEIGER, J., concur.